## UPJOHN HEALTHCARE SERVICES, INC. v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES and BAPTIST HOME HEALTH CARE, INC. v. DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case Nos. 83-3247 and 84-1144

State of Florida, Division of Administrative Hearings

February 6, 1985

### APPEARANCES OF COUNSEL

**Donna H. Stinson, Moyrle, Flanigan, Katz, Fitzgerald and Sheehan, P.A.,** for petitioner, Upjohn Health Services, Inc.

**F. Philip Blank** and **W. Douglas Beason** for petitioner, Baptist Home Health Care, Inc.

**Thomas W. Stahl, Culpepper, Turner and Mannheimer,** for respondent, Department of Health and Rehabilitative Services.

**Leonard A. Carson** and **Robert P. Daniti, Carson and Linn, P.A.,** for intervenors, Northwest Home Health Agency, Inc., and Florida Association of Home Health Agencies, Inc.

### OPINION

RECOMMENDED ORDER

ROBERT T. BENTON, II, Hearing Officer.

This matter came on for hearing in Tallahassee, Florida, before the Division of Administrative Hearings by its duly designated Hearing Officer, Robert T. Benton, II, on August 16, 1984, and concluded the following day. The Division of Administrative Hearings received the transcript of proceedings on October 17, 1984. By order entered October 30, 1984, the intervenors' agreed motion for extension of time was granted and the provisions of Rule 28-5.402, Florida Administrative Code, were deemed waived. A second order granting a further extension sought by another agreed motion was entered November 15, 1984.

The parties filed proposed recommended orders on November 19 and 20, 1984, provisions of which have become the subject of motions to strike filed on November 29 and December 5, 1984. Except as otherwise indicated by orders entered on these motions to strike, the parties' proposed findings of fact have been considered, and they have been adopted, in substance, except insofar as they are unsupported by the weight of the evidence, immaterial, cumulative, subordinate, or unnecessary. The parties are represented by counsel.

After the Department of Health and Rehabilitative Services (HRS) proposed to deny the applications for certificate of need to establish a home health agency in Escambia County, filed in the spring of 1983, by Upjohn Healthcare Services, Inc. (Upjohn), Upjohn initiated formal administrative proceedings, by letter dated September 12, 1983. Case No. 83-3247. Upjohn subsequently filed an amended petition, and the matter was set for hearing on January 27, 1984. Over HRS' objection, the final hearing was continued, on Upjohn's motion, until August 16, 1984. On July 31, 1984, Baptist Home Health Care, Inc. (Baptist) was granted leave to intervene; and Northwest Florida Home Health Agency, Inc. (NWFHHA) was allowed to intervene by order entered August 14, 1984.

In the fall of 1983, Baptist had filed its own application for certificate of need to establish a home health agency to serve not only Escambia County but also Santa Rosa County. After HRS proposed to deny Baptist's application, Baptist filed a petition for formal administrative hearing which HRS transmitted to the Division of Administrative Hearings, where it was received on March 29, 1984. Case No. 84-1144. By order entered July 10, 1984, petitions to intervene in Case No. 84-1144 filed by Upjohn and by the Florida Association of Home Health Agencies, Inc. (FAHHA) were granted. At the final hearing, counsel advised that the Hearing Officer presiding in Case No. 84-1144, when the question of intervention arose, ruled on the record, alowing

NWFHHA to intervene, as well, but that this ruling was not reduced to writing.

With the agreement of the parties, Case Nos. 83-3247 and 84-1144 were consolidated. Also on the record at final hearing, Baptist took a dismissal as to Upjohn's application, Upjohn took a dismissal as to Baptist's application, and FAHHA disclaimed any right or intention to participate in opposition to Upjohn's application. The parties stipulated that Upjohn, if otherwise entitled, should receive a certificate of need, if the evidence showed a need for an additional agency, without regard to Baptist's application; and that Baptist's application, which was filed in a later batch, should be granted only if the evidence showed a need for two or more additional home health agencies.

After the hearing had concluded, HRS abandoned its opposition to Upjohn's application and joined with Upjohn in a stipulation and notice of dismissal, filed January 29, 1985. This stipulation, in which NWFHHA did not join, recites: "HRS agrees to issue Certificate of Need No. 2628 to Upjohn for a home health agency in Escambia County, within ten days. . . ."

## ISSUES

Whether HRS should grant Upjohn's application for certificate of need to establish a home health agency in Escambia County? Whether, in light of the recommended disposition of Upjohn's application, HRS should grant Baptist's application for a certificate of need to establish a home health agency to serve Escambia and Santa Rosa Counties? Whether an application for certificate of need and HRS can by stipulation divest the Division of Administrative Hearings of jurisdiction over the application and defeat the right to a existing provider to proceedings pursuant to Section 120.57(1), Florida Statutes (1984 Supp.)?

## FINDINGS OF FACT

Since June 4, 1978, Upjohn has operated a home health service from its Pensacola office, one of 22 such offices in Florida, 16 of which are licensed as home health agencies. For more than three years, Upjohn has performed various services under contract to HRS from its Pensacola office. In Escambia, Santa Rosa, Okaloosa, Walton and Bay Counties, Upjohn now provides home nursing care, homemaking services, live-in companions and nurses' aides. Medicaid and medicare would pay for some, but not all, of the services Upjohn already provides in Escambia County, if Upjohn's Pensacola office were licensed as a home health agency. The certificate of need Upjohn seeks here is a prerequisite to such licensure.

180

Upjohn provides services which are not offered by either of the home health agencies now licensed to serve Escambia County. Some people receiving these services must turn elsewhere for related services in order to obtain reimbursement from medicaid or medicare for the related services. This can create coordination problems such as the one mentioned at hearing: If employees from both agencies arrived at the same time, one might have to wait while the other "performed services", e.g., administered an injection.

Like Upjohn, Baptist is already in the home health care business and provides services not offered by either of the licensed home health agencies serving Escambia County (one of which also serves Santa Rosa County. Since October 2, 1983, Baptist has operated in Escambia and Santa Rosa Counties, albeit without the benefits of licensure as a home health agency. In 1984, to the time of final hearing, Baptist had seen 163 patients, ten to twelve of whom it had referred to NWFHHA because they were eligible for medicare benefits, but only if they received services from a licensed provider. Like Upjohn, Baptist provides various technical nursing services, such as hyperalimentation and intravenous administration of antibiotics. Baptist also provides oxygen therapy and chemotherapy, once a physician has administered an initial dose. In addition, Baptist deals in durable medical equipment including bedside commodes, walkers, and the like. Baptist intends to offer physical, occupational and speech therapy if it receives a certificate of need, although it does not now offer these services.

Durable medical equipment expenses and physical therapy fees are reimbursable by medicare Part B without regard to the provider's licensure. All of the services which the applicants provide and for which they are now reimbursed by medicare are available in Escambia and Santa Rosa Counties from providers who are licensed and eligible for reimbursement.

### COMPETITORS LICENSED

Already licensed to provide services in Escambia and Santa Rosa Counties as a home health agency is Northwest Florida Home Health Agency, a nonprofit corporation that opened for business in 1975. The number of visits NWFHHA makes monthly has risen from 629 in 1980 to 1709 in 1984. Of the 902 patients NWFHHA served in the fiscal year ending March 31, 1984, only twelve were not eligible for medicare benefits. NWFHHA has headquarters in Gulf Breeze and is the only licensed home health agency serving Santa Rosa County. Nothing prevents NWFHHA staff from providing nursing services gratis on their own time, but there was no evidence that this occurs. NWFHHA

181

offers only services that medicare reimburses, *viz.*, skilled nursing, physical, occupational and speech therapy, and medical social worker and home health aide visits. NWFHHA's office hours are from eight o'clock in the morning until four o'clock in the afternoon Monday through Friday. After hours, nights and weekends a telephone answering service, "the doctors and nurses registry," answers calls placed to NWFHHA's office telephone, and relays messages to a nurse. A nurse is always on call, and registry personnel either telephone the NWFHHA nurse on call or contact her with a beeper pager system.

The only other licensed home health agency serving Escambia County is the oldest, the Visitng Nurses' Association (VNA) which has been "absorbed" into the Escambia County Health Department. In the fiscal year ending June 30, 1983, the VNA served 465 medicare patients and 303 others, including patients unable to pay, those who could and did, and those whose insurance companies paid for services. The VNA does not sell or rent durable medical equipment but enjoys good relationships with suppliers and has never been unable to obtain equipment needed by its clients. The VNA provides skilled nursing services, including enteral therapy, post-colostomy and other stomal care, nutritional counseling, home health aides and, through another branch of HRS, social services. The VNA has never turned away a medicare or a medicaid patient in need of its services.

VNA's office hours are from eight o'clock in the morning till half past four o'clock in the afternoon Monday through Friday. Between the same hours on Saturdays, Sundays and holidays, VNA has a "weekend nurse" who can be reached through the doctors and nurses registry. (T.369) VNA's services are generally unavailable before eight o'clock mornings and after four-thirty evenings, and VNA cannot be reached by telephone during those hours, unless, like Judy Gygi, the director of social work department at West Florida Hospital, a person has the VNA "call-back number."

### NEED

In comparison to hospitals, home health agencies can open shop relatively quickly, once the decision to do so is made. A "planning horizon" of one year for home health agencies is more appropriate than the five-year horizon used for hospitals. This is particularly true here where both applicants are already engaged in offering the services for which certificates of need are sought.

The need for home health services may be seen as a function of the age and size of a population. In 1985, Escambia County is projected to have a population of 254,100 persons of whom 23.04 percent would be

182

younger than 15 and 10.1 percent would be 65 or older. The 1985 population of Santa Rosa County is projected at 62,600 of whom 24.63 would be under 15 and 7.9 percent would be 65 or over. For District I as a whole, comprising Escambia, Santa Rosa, Okaloosa and Walton Counties, the 1985 population is projected at 464,300, including 23.39 percent under 15 and 9.35 percent 65 or over.

An expert retained by Upjohn predicted a need for 1985 for up to 27 home health agencies in District I, and for at least two and up to 18 home health agencies in Escambia County alone. Upjohn's expert invoked four methodologies. Common to each was the assumption that the average patient can be expected to receive 31.5 home visits, a number HRS generated to reflect statewide experience. Changes in medicare reimbursement for hospital care seem to have decreased the average length of stay in Escambia County hospitals by nearly a full day over the last two years or so. This is thought to have created additional home health clients who need significantly fewer visits than historical averages might suggest. VNA's recent experience has been on the order of 14 visits per patient as compared to NWFHHA's recent average of approximately 36 visits per patient.

At least two of the four methodologies generated prediction for 1985 of home health care visits in Escambia and Santa Rosa Counties, without regard to whether their cost was reimbursable by medicare. Nationally about 18 percent of Upjohn's services are reimbursed by medicare. A rough rule of thumb is that the "medicare need" is one fifth of the total need.

Using a method he denominated "U.S. DHHS", Upjohn's expert predicted that there would be 5,836 home health referrals in Escambia County in 1985 as compared to 8,692 for the whole of District I, in 1985, so that the number for Escambia County would exceed two-thirds of the district total. Even assuming the "U.S. DHHS" methodology is a good one, something is amiss with the calculations, because the 1985 population of Escambia County is projected to amount to only 54.73 percent of the district total; and Escambia County is not projected to have as much as two-thirds of any age cohort in District I in 1985. According to Upjohn's Exhibit No. 3, the "U.S. DHHS" method projects only medicare referrals, but this is an apparent error. According to the same exhibit, the "U.S. DHHS" predicts more than four times the number of medicare referrals for 1985 in Escambia and Santa Rosa counties than the only other medicare method, "DHRS Option 2," predicts. On the 20 percent medicare assumption, the "U.S. DHHS" calculations predict a level of home health care referrals in Escambia County ten times higher than the "District I Draft HSP"

method predicts. The two "total referral" methods predicted 2,881 and 3,637 home health referrals for Escambia County and 696 and 878 for Santa Rosa County for 1985. Neither of these methodologies has been validated because, as Upjohn's Dr. Dacus explained, "there is just no reliable, verifiable data base, which reflects the total volume of home health care services." (T. 136). The final method, "DHRS Option 2", predicts 1,359 home health medicare referrals for Escambia County in 1985 and 267 such referrals for Santa Rosa County in 1985, a two-county total of 1626.

Annualizing from Intervenors' Exhibits 2 and 5, the VNA can expect to make 5102 visits [2976 (12 divided 7)] in 1984 for which medicare Part A will reimburse; and NWFHHA can expect to make 20,388 visits (April, May and June home health aide, nurse, and paramedic visits quadrupled), for almost all of which it will seek reimbursement from medicare, if past experience is an indication. Dividing 5102 by 14 and 20388 by 36 yields a total of 931 medicare referrals for Escambia and Santa Rosa Counties for 1984, which suggests that the 1626 prediction for 1985 is a substantial overprediction. Area specific utilization rates suggest, on the generous assumption of a five pecent increase in 1985 over 1985, and on the twenty percent medicare assumption, 4888 home health referrals for Escambia and Santa Rosa Counties in 1985.

Assuming medicare visits increase in Escambia and Santa Rosa Counties by ten percent in 1985 over 1984 levels, 28,0389 visits can be expected. Upjohn's own policy is to form a subunit only "once you get up to around 15 or 20 thousand visits." (T.119). The national average is on the order of 7,000 visits per year per agency.

## NO NEED SHOWN TO BE UNMET

But no net need is shown on this record because of the incomplete evidence as to what existing home health services already provide. The evidence did not show the total number of home health care visits now being made in Escambia and Santa Rosa Counties or either of them. Nor was it clear from the evidence whether the applicants and the licensed agencies are the only providers of home health services in the area.

There has never been a waiting list for home health services in Escambia County and neither of the two Escambia county medicare providers had added staff in the twelve months preceding the final hearing.

Specifically, there was no showing that medicare-reimbursed services

184

would be in any way lacking in 1985. The evidence affirmatively established that they would be readily available, unless the existing providers cease offering these services. The most interesting effort to show that there might be a problem was proof that a judgment for $105,000 against NWFHHA had not been paid. This amount exceeds the amount of NWFHHA's assets and no doubt presents serious legal problems for this non-profit corporation. But this evidence[1] falls short of establishing by a preponderance that NWFHHA will cease to provide home health services in 1985. Upjohn's expert witness testified that the only capital costs for home health agencies was "so low . . . just the cost of the office, having the office there." (T.114). Even if NWFHHA is stripped of its assets in order to satisfy the outstanding judgment or to obtain discharge in bankruptcy, its viability as an ongoing enterprise would persist. Office rent would be its chief working capital requirement and revenues would readily cover that.

Both the VNA and NWFHHA can provide significantly more home health services without adding additional staff. To the extent Upjohn and Baptist serve non-medicare patients that VNA would otherwise have served, VNA's ability to deliver home health services to medicare-eligible patients is enhanced. Nothing in the evidence established that any medicare-eligible patient in Escambia or Santa Rosa Counties has encountered difficulty in obtaining home health services in the past or will in the foreseeable future.

## FINANCES

Home health agencies differ from hospital and other similar health care providers in that their fixed costs only amount to one or two percent of total costs. In order to serve more patients, they need only add staff. Patients' homes are the principal workplace, and capital expenditures entailed in expanding are minimal. The record is replete with theories about economies and diseconomies of scale, but these offer little practical guidance. "If you try [to] plot a curve of home health care average charge per visit [versus the number of visits] you cannot get a defined line. You get a very steady [flat] line with a lot of random variances across it." (T.115). The mix of services offered is more significant than the volume of services, although there is some correlation between volume and mix. (T. 117, 118) "[G]oing further and further away . . . [to see] patients . . . increase(s) travel costs . . .

---

[1] Upjohn's attempt to reopen the record after the hearing had concluded to offer a copy of a pleading represented to be NWFHHA's voluntary bankruptcy petition was met with NWFHHA's motion to strike notice of additional authority, granted by order entered February 1, 1985.

[s]o you get an expanding component of travel expense" (T. 119) if the geographical area being served expands.

The medicare program reimburses costs of home health services up to a cat, which is $50.26 per visit for the current fiscal year. The rate of reimbursement for services to medicaid patients is much lower ($16 per visit). The average cost per NWFHHA medicare visit during the 1983-1984 fiscal year was $23.26, and the average cost per VNA medicare visit was $29.62 during the 1982-1983 fiscal year. Because of differences in the mix of services, the applicants' average cost figures are not strictly comparable, but there was no proof that the cost of providing medicare services would go down if these applications are granted.[2] Neither applicant showed projected costs at less than what the existing providers are experiencing. NWFHHA's costs are the lowest in Florida and there is nothing in the evidence to suggest that Baptist or Upjohn will be able to provide medicare services for as little as the existing providers. As a result, the medicare program and so the taxpayers would be paying more for the same services, as far as the evidence shows, if either application is granted.

## CONCLUSIONS OF LAW

When HRS received Upjohn's request for administrative hearing on its proposed denial of Upjohn's application for certificate of need, HRS "elect[ed] to request a hearing officer from the division," Section 120.57(1)(b)(3), Florida Statutes, (1984 Supp.) to conduct formal administrative proceedings. With that election, HRS surrendered any right to "take . . . further action with respect to the formal proceeding, except as a party litigant, as long as the division has jurisdiction over the formal proceeding." Section 120.57(1)(b)(3), Florida Statutes, (1984 Supp.)

The "stipulation and notice of dismissal" that HRS and Upjohn executed and filed after the formal hearing but before entry of this recommended order is nugatory, null and void, at least insofar as HRS' purported undertaking to issue a certificate of need to resolve Case No. 83-3247. Only with entry of the present recommended order does the jurisdiction of the Division of Administrative Hearings or its hearing officer cease. HRS cannot lawfully dispose of this case, except by final order consequent on this recommended order. HRS need not (although

---

[2] In the proposed recommended order of intervenors, the average cost per home health visit are put at $46.33 for Upjohn and $43.40 for Baptist, with citations to supplements to their respective certificate of need applications. But these supplements were not attached to the applications that came in evidence as Baptist's Exhibit No. 1 and Upjohn's Exhibit No. 1, as far as the hearing officer can discover.

186

it may) adopt a recommended order. HRS "in its final order may reject or modify the conclusions of law and interpretation of administrative rules, but may not reject or modify the findings of fact unless . . . [certain conditions exist]," Section 120.57(1)(b)(a), Florida Statutes, (1984 Supp.), and may enter no final order whatever as long as jurisdiction remains in the Division of Administrative Hearings or one of its hearing officers.

Although these cases have been consolidated by agreement of the parties, Baptist took a dismissal as to Upjohn's application and FA-HHA has never opposed the Upjohn application, so that the only party participating on Upjohn's application, in addition to Upjohn and HRS, is NWFHHA, the existing provider who intervened as a third-party objector without opposition. HRS cannot defeat one substantially affected party's right to proceedings pursuant to Section 120.57(1), Florida Statutes, (1984 Supp.) by agreeing on a final disposition with another substantially affected party. Neither HRS nor Upjohn filed anything opposing NWFHHA's petition to intervene. Once the petition was granted, NWFHHA attained party status equivalent to that of all other parties to the proceeding. With the matter pending before a hearing officer of the Division of Administrative Hearings, neither HRS, Upjohn nor any other litigant, singly or in combination, can by fiat extinguish an adverse party's right to participate in formal proceedings. Upjohn has withdrawn its petition for hearing, but not its application for certificate of need. As a substantially affected party, NWFHHA, no less than Upjohn, has the right to insist that the fate of the pending application be determined in formal administrative proceedings, pursuant to Section 120.57(1), Florida Statutes, (1984 Supp.)

The courts view it "as fundamental that an applicant for a license or permit carries 'the ultmate burden of persuasion' of entitlement through all proceedings, of whatever nature, until such time as final action has been taken by the agency." *Florida Department of Transportation v. J.W.C. Co., Inc.*, 396 So.2d 778, 787 (Fla. 1st DCA 1981). An argument can be made that Upjohn, by withdrawing its request for hearing, has abandoned all efforts to meet its burden of proof to show entitlement in these proceedings to the certificate of need it seeks, but this interpretation of Upjohn's joinder in the stipulation and notice to dismiss is difficult to reconcile with surrounding circumstances and has been rejected.

### THE MERITS

In any event, neither applicant succeeded in demonstrating a need for more medicare providers in Escambia or Santa Rosa Counties.

"The injury in this cause has to do with services for the benefit of *Medicare* recipients." *Vari-Care, Inc. d/b/a Hospitality Home Health, Inc. v. State of Florida, Department of Health and Rehabilitative Services*, No. 84-1085, at p. 16 (DOAH; RO entered Jan. 11, 1985) and consolidated cases. Unlike Texas, Florida requires that home health agencies obtain certificates of need in order to be eligible for licensure, and reimbursement for providing medicare services. Section 381.494(1)(f), Florida Statutes, (1984 Supp.) For purposes of the certificate of need law, 'Home health agency' means an agency as defined in Part III of Chapter 400, Section 381.494(3)(j), Florida Statutes, (1983), *viz.* "Any . . . organization . . . whether operated for profit or not, which provides home health services or seeks certification as a Medicare home health service provider." Section 400.462(2), Florida Statutes, (1983). A certificate of need is a prerequisite to licensure as a home health agency. Section 400.471(3), Florida Statutes (1983). Unless a provider seeks reimbursement for medicare services, however, there is no need for licensure. No license is required in order to furnish home health services.

By prehearing stipulation the parties agreed to eliminate as issues the criteria set forth in Section 381.494(6)(c)(3), (6), (7), (8), (10), (11) and (13), Florida Statutes, (1984 Supp.), which leave for consideration the following:

1. The need for health care facilities and services and hospices being proposed in relation to the applicable district plan and state health plan adopted pursuant to Title XV of the Public Health Service Act, except in emergency circumstances which pose a threat to the public health.

2. The availability, quality of care, efficiency, appropriateness, accessibility, extent of utilization, and adequacy of like and existing health care services and hospices in the service district of the applicant.

. . . . . . . . . . .

5. Probable economies and improvements in service that may be derived from operation of joint, cooperative, or shared health care resources.

. . . . . . . . . .

9. The immediate and long-term financial feasibility of the proposal.

. . . . . . . . .

12. The probable impact of the proposed project on the costs of providing health services proposed by the applicant, upon considera-

■■■■■■

tion of factors including, but not limited to, the effects of competition on the supply of health services being proposed and the improvements or innovations in the financing and delivery of health services which foster competition and service to promote quality assurance and cost-effectiveness. Section 381.494(6)(c), Florida Statutes (1983 Supp.)

HRS' rule purporting to define the need for home health services has been found invalid, *Department of Health and Rehabilitative Services v. Johnson and Johnson Home Health Care, Inc.*, 447 So.2d 263 (Fla. 1st DCA 1984), so that all elements of the need and methodology are susceptible to ordinary methods of proof.

Both applications were shown to be financially feasible. Both relate to ongoing services that have already demonstrated financial feasibility, even without medicare revenues, and promise future economic viability, even without adding medicare revenues.

Since both applicants offer non-medicare-reimbursable services not offered by VNA or NWFHHA, those services, when needed by medicare-eligible persons also receiving medicare services could be furnished at a savings in transportation expenses for the provider. There was no showing how many people, if any at all, fall in this category. If there are people who need this combination of services, one of the applicants could deliver both services more efficiently and the provider's expenses would drop, but it does not follow that either charges or medicare costs would fall. The purpose of the certificate of need law is not to maximize providers' profits.

The Health Facilities and Health Services Planning Act, Section 381.494 *et seq.*, Florida Statutes (1984 Supp.) has been characterized as creating a regulatory mechanism designed "to contain the high and rising cost of health care." *Bio-Medical Applications of Clearwater, Inc. v. Department of Health and Rehabilitative Services, Office of Community Medical Facilities*, 370 So.2d 19, 20 (Fla. 2d DCA 1979) (reh. den.). The applicants did not prove that they would be able to offer services at less cost to the medicare program. The evidence showed that NWFHHA's costs are less than any other home health agency in Florida, and the record as a whole supports the view that granting either certificate of need would lead to higher costs to the medicare program for the same services.

Competition for business not reimbursed by medicare is to be welcomed and should tend at least to slow the rise in charges. But no certificate of need is required in order to offer these services. It is, accordingly,

189

RECOMMENDED:

That HRS deny Upjohn's and Baptist's applications for certificates of need for home health agencies in Escambia and Santa Rosa Counties. Editor's Note: Rulings on Motions filed subsequent to the Recommended Order were denied and the Final Order adopting the Recommended Order was entered on July 3, 1985.